Case number 14-2545. Jeremy Jennings v. County of Monroe, et al. Argument not to exceed 15 minutes per side. Mr. Palmer, you may proceed for the appellant. May it please the Court. My name is Charles William Palmer, representing Jeremy Jennings. Before I start, I just want to say something about the context in which this occurred. Unfortunately, in this country, there still is a great stigma attached to mental health. And so people who seek and attain mental health treatment are people who suffer from mental illness and suffer from discrimination. And that's part of the intent of the ADA, is so that employers will not treat people according to some improper kind of stereotype. And that's what we believe occurred in this case, that Mr. Jennings had a mental illness. He had post-traumatic stress syndrome. He kind of lost an awful deep end. I thought that was a very good characterization on the evening of the question. Did some crazy, stupid things and then admitted himself to a hospital for five days. Was there really any dispute about whether what he did, ignoring why he did it, would violate the code of conduct and justify his firing? Well, I don't know if there's a dispute. There's some confusion about it because his recollection Are you arguing that what he did, absent what you say is the reason for what he did, is insufficient to fire him? Well... He gets dropped. Really, they don't even need a reason, Your Honor. He takes pills from somebody else, he gets drunk, he drives for hours and he doesn't even remember what he was doing. And he's simply unavailable to perform his on-call duties during that period. You're right. In a general case, that should be an option. Under Michigan law, Your Honor, he's a now-billed employee. So that means he could be fired for any reason or no reason. So that's correct, Your Honor. So the argument seems to be that because he did those things, he did those things because he had a disability. Therefore, if you fire him for those things, you are in essence firing him in violation of the federal law because of his disability. That's the argument, isn't it? Well, that's part of it, Your Honor. I mean, you have to also remember this all occurred off-duty. Well, let's just keep with the part of it I meant and then I won't ask any more questions. Okay. That would otherwise be a compelling argument, except our cases seem to me to say that you can legitimately fire an employee for conduct, even conduct that occurs as a result of a disability, if the conduct disqualifies the employee from his job. So, assuming that I'm saying that correctly, if the conduct is sufficient, which seems to me it probably would be, even if it was just cause, let alone at will, that's where I'm having trouble seeing how you wouldn't. Well, the problem is, Your Honor, what's the true animus? In other words, is there a reason, is there a stated reason for the discharge? Is that really the reason or not? So the question is, when Mr. Frank decided to terminate his employment, was it because he was embarrassed to have an employee who had a mental illness and disability or was it because of the actual conduct? And the problem is, and I think the troubling thing about this is, if you look at his statements and their actions, they're inconsistent and they suggest that maybe that's not really the real reason, that it's really a form of mental health discrimination. I guess I wasn't going to ask anything with that unless you were like, where is there anything in the record to now support your argument that they were embarrassed to have an employee with a mental health problem? I don't see that discussed anywhere in your briefs. There's no direct evidence of that. No, no, I didn't ask whether there's evidence of that. I don't even see where you made that argument. Well, because the whole issue was, was it because Do you not use the word embarrassed in your briefs? No, you're right, Your Honor. I was just trying to put it in the context of the type of discrimination we're dealing with. And so the real issue in this case, I think boils down to, is was there sufficient evidence creating some doubt about the veracity of what they said the reason was and what the real reason was? And the problem is, if in fact, and you're right, if in fact they had the right to fire him the minute this happened, then why didn't you do that? Why didn't you do the whole thing where you're going to go to the duty disability examination and then ignore all those recommendations? Why would you say that you've lost trust in What recommendations are you referring to? The ones about if he's brought back in 30 days? Right. Dr. Kasselman did a duty disability evaluation, recommended he be returned to work. Dr. Kasselman also said he was not disabled. That's right. I believe you mentioned disability or otherwise, right? That's correct. Your Honor, there's an important distinction between talking about whether in fact by that time he'd recovered from his post-traumatic stress syndrome and was in fact no longer disabled from work and whether he had a disability. Because under the EEOC guidelines, if you have episodic, it's in the statute also, if you have a disability that's episodic. If it's disabling while it's episodic, it's still a disability. I think you make an interesting argument because sometimes we get cases where somebody, they don't try to figure out what the underlying cause is and then claim as they've been fired prematurely. This is the averse of that where they did try to figure out what was going on and it seems to me Frank answered your question in the deposition where he said because if in fact he had some type of disability that I didn't know about, then that's a totally different look and quote. That's why he says he waited. Is there some evidence in the record that you believe undercuts that explanation? The fact that they didn't want to own up to the fact that they made this decision within two days of his release from the hospital. There's that email from Sheriff Crutchfield to Andre Armstrong saying, you know, we've decided this game cannot be returned to work. And so it's clear, I think, that the decision is... Would you have had a claim if they fired him then? Probably not. Okay, so... Excuse me, we cannot talk at the same time. I'm sorry. So the claim arises because they actually waited to get a doctor's report that said he's not otherwise wouldn't have had it? There's an alternative explanation, Your Honor, in that they wanted to create some other cover for their real reason. And that's, I think, our argument is that, you know, yeah, they could have fired him that day. And if that was the reason, then why didn't they? What do you tie that reasoning in the record? I mean, it seems nothing... I mean, they could have had a reason. They could have... I mean, you know, every lawsuit can be full of could-haves. But, you know, under our system, we don't look at could-haves. We look at, you know, what the evidence tells us. In what I submit to you, the evidence shows in this case, Your Honor, is that he had a disability and that their reason, stated reason for determining him was protection. You say you're afraid that there's abundant evidence in the record suggesting that James' behavior was caused by his PTSD. Yes, sir. What evidence is there that the county knew of any causal connection between, I guess, his behavior-like attempt in the 11th and the PTSD? It's detailed in my brief, Your Honor, but I believe that Sergeant Ansel and Sergeant Plath, who... Sergeant Ansel was the guy who was running around trying to find him that night, and Sergeant Plath, who took him to the hospital. He also had discussions with, I believe, other people, so he knew that he was acting... He had second-hand hearsay information that he was acting irrationally, that his wife was concerned that he was suicidal. But that was because of the domestic dispute, wasn't it? Well, if you look at Dr. Kastner's report, she says, yes, he's having marital problems, but she also believes that this childhood sexual abuse was very prominent in the cause of his breakdown. Well, there's nothing still... I mean, we're back to the same point. There's nothing in the lay or the expert testimony that ties this series of incidents to PTSD. Well, I think fair reading, Dr. Kastner does. I believe she does say that that's her diagnosis, and I believe she makes her out during when the other counsels are. I'll see if I can find that reference, but I believe there is that suggestion in her report. So if you have any further questions, I'll sit down and we'll let counsel go ahead. Thank you. And I apologize, Judge McKee, I get a little excited. Just want to jump in here. Enthusiasm's good. Ms. Stefanski. Good morning. May it please the Court, Mercy Stefanski on behalf of the defendants and the ladies in this case. I just want to touch briefly on matters with respect to disability under the ADA amendments and then move on to the second issue that the Court has spoken to time to discussing. Although Congress has relaxed requirements with the passage of the ADA amendments, it did not absolve the claimant from proving a disability, and it is clear that not every condition or impairment or diagnosis constitutes a disability. Of course, the Court must still discern whether the condition substantially limits a major life activity as compared to most people in the general population. In doing so, the Court considers the condition, manner, duration of the effect on a major life activity, and whether an impairment substantially limits a major life activity requires an individualized case-by-case assessment. In this case, the district court practically held that there was simply not enough evidence in this record to draw such a conclusion. In touching briefly upon what the Court was discussing with the Brother Council, in the U of M records, which is where a claimant was hospitalized after the incident, they indicated that a claimant's PTSD was subclinical or asymptomatic at the time. This relies with very little discussion or evidence on the major life activities of sleeping, working, thinking, or concentrating. However, there was no evidence here to set a claimant apart from the general population with regard to those activities. As to working, on one occasion, the claimant missed a handful of days from work. The district court recognized that most people missed time from work for various reasons, whether they be medical or personal, and that nothing about this one time, relatively short absence, substantially affected his ability to work in a broad class of jobs. The same is true with regard to sleeping, thinking, and concentrating. Most people have difficulty with those activities on an occasional basis, and again, the district court properly held that a claimant failed to show that these activities were substantially limited by his PTSD diagnosis. Moving on to the second issue, which is the legitimate basis for his termination, Judge Smith did show that the reason for his termination was a pretext for discrimination. The employer's reason for terminating the plaintiff was based on his misconduct on the night in question. The ADA was not intended to be interposed as a sword or a free pass to engage in misconduct or illegal behavior, as plaintiffs used to do here. The evidence here demonstrates that he had engaged in an extramarital relationship with a co-worker, his marriage was falling apart, he had moved out of the family home, and after a marriage counseling session, he drank a bottle of tequila and took unprescribed medication from someone else. Those citations are at page, the record at page 186 and 187, I know that. And again, Helen's brief had indicated there wasn't support for that in the record, and there certainly was plaintiff medication. Judge Gibbons asked Mr. Palmer what's the connection between those activities and the PTSD. Is there any evidence to support that? There's no evidence. What he's going to say when he stands back up is that Dr. Kasselman's opinion said the incident does appear to be an aberration caused in part by recent recollections of sexual and physical abuse and a history of low self-esteem. So, assuming he found what I found, that's what he's going to say, so I'm telling you that to give you an opportunity to comment on that. Sure, thank you. I think that what's very relevant to recognize here is that right after the incident occurred, Director Frank had indicated, along with Sheriff Crutchfield, who posted on the board that determines whether he would be terminated or not, they were both of the opinion based on the misconduct that occurred that night and after Director Frank's discussions with the officers who were involved, that he was no longer in a position where Director Frank would have confidence in his ability to lead his subordinates based on the misconduct. That has nothing to do with the PTSD diagnosis. It has nothing to do with Dr. Kasselman's report. It was their opinion immediately after the incident had occurred. Now, they did take the time based on advice from HR to go through and investigate and discuss the matter with the plaintiff and to consider the reports, at least Director Kasselman said that they had. But nonetheless, it was not going to be, any kind of PTSD diagnosis was not going to be a free pass to engage in this kind of conduct. This is the Assistant Director of 911 Dispatch, who is responsible for a number of employees. This central dispatch handles emergency calls for the entire county and for all the cities and townships within the county, not just law enforcement, fire personnel as well. A lot of these transmissions that occurred that night were broadcast over the radio. His subordinates knew about it. And Director Frank had a legitimate basis to believe that he could no longer effectively lead. I mean, this is a person who engaged in illegal conduct and drove away so quickly from the scene that his front officer, Ansel, couldn't even keep up with him, didn't even want to try because it was so dangerous. He blacked out when he was on call. And he's required to be on call, and that's at record entry 309, page 309. There's just nothing to tie it to a PTSD diagnosis per se, as opposed to all of the misconduct that occurred that night. And in fact, the immediate opinion of the director, based on that misconduct, before there was any medical information whatsoever suggesting it was a result of PTSD or there was any even tenuous connection to it, was that I can't rely on him anymore. So as much as Plante would like to suggest or speculate that there might be some sort of motivation based on a disability, the evidence just doesn't support it. I think that covered most of what I was going to say next, but I just would like to close with while Congress relaxed the ADA requirements, it didn't condone someone with a mental illness or PTSD to engage in this type of illegal conduct and then forbid an employer from imposing consequences. Plante's argument would insulate anyone with PTSD from employment action regardless of their misconduct. And Congress surely did not intend that, and it's a dangerous precedent to set. Unless the Court has any other questions, I will just ask that the Court refer to the District Court. Thank you. Well, I don't want you to get all hung up on the PTSD, because that's not the only diagnosis that's in the record. This is a man who was hospitalized for five days in a mental health hospital. The hospital said he had a history of PTSD. Actually, they said he had a mood disorder. So whether it's PTSD or a mood disorder, there's clearly evidence that this man had a mental illness that was significantly affecting his ability to live his normal life during this five-day period in the day or weeks before. But if it's true that that doesn't give him a free pass in connection with the conduct that he engaged in, you'd have to loop back to where you were to begin with. It said this firearm wasn't based on the conduct, but rather it was based on some animus because of whatever his conditions are. But where is that in the record? The question is, was the reason stated for his discharge credible under the circumstances? And because they didn't own up to it, or didn't admit that that was the reason at first, because why go through with this whole… They didn't admit to what was the reason. Well, in other words, Your Honor, if they were going to say that these actions of that evening were the cause of his discharge, then why wouldn't they just say that? They didn't have to wait for a duty disability evaluation. They could have fired him the next day. They could have fired him while he was in the hospital. But that's not what they said, and that's not what they did. So that creates a question about, is this really a credible reason? I think it creates a question of fact as to whether there's a pretext. And by the way, there's a lot of allegations here about his drug and alcohol use. And I pointed out in my reply brief, he was actually drug tested and alcohol tested at the hospital the morning after the incident, and the tests were negative. So, you know, I think we've got to be very careful about how intoxicated we want to make him that evening. He was intoxicated after the blackout, so he didn't remember, right? Well, he was – so he didn't remember. That's right, Your Honor. So unless you have any other questions, I'm not going to beat the horse up here. Okay. We appreciate the argument both of you have given, and we'll consider doing things carefully. With that, since there are no other arguing cases, we're adjourned.